Filed 9/20/22  Urick v. Urick CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WILLIS E. URICK, III, | B313980, B315720 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BP171001 consolidated with Nos. 16STPB00850, 16STPB00852, 16STPB00854) |
| v. | |
| DANA URICK, | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Paul T. Suzuki, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed and remanded.

Horvitz & Levy, John A. Taylor, Jr., and Rebecca G. Powell; Higgs, Fletcher & Mack, John Morris, Roland H. Achtel and Rachel M. Garrard for Defendant and Appellant.

Snell & Wilmer, Michael A. Angel, Roger A. Grad, Jing Hua; Greines, Martin, Stein & Richland and Robin Meadow for Plaintiff and Respondent.

Appellant Dana Urick's attorney was hospitalized 10 days before trial on two complex probate petitions with potentially devastating consequences, which had been filed against Dana by her brother, respondent Willis E. Urick, III.[1] The probate court denied Dana's request for a continuance, and after holding a trial with no appearance for Dana, granted petitions to remove Dana as trustee of their mother's trust and to disinherit her. Dana appeals from the orders granting the petitions on the ground that the trial court abused its discretion by denying her request for a continuance and it is reasonably probable that she would have obtained a more favorable result.

We conclude that it was an abuse of discretion under the circumstances of this case to deny the request for a continuance, and to the extent that Dana must show prejudice, it is highly likely that she would have obtained a more favorable outcome had the continuance been granted. To meet his burden to show Dana violated the "no contest" clause of the trust, Willis needed to prove Dana filed a direct contest to the trust without probable cause. Specifically, in this case, he had to show that Dana filed a petition to reform the trust in her individual capacity as a beneficiary based on specific statutory grounds, including fraud, duress, or undue influence, and that she had no probable cause to believe the probate court would grant the relief that she sought with additional investigation or discovery. The record reveals that Dana intended to present evidence at trial that, if credited by the trier of fact, conclusively established she filed the pleading

---

[1] Because multiple parties share the last name Urick, they will be referred to by their first names for ease of reference. Phillips Academy Andover joined in the petitions in the probate court, but has not filed a respondent's brief on appeal.

solely in her capacity as trustee. In addition, Dana's evidence reflected that her pleading was based on allegations of mistake, and any stray allegations suggesting fraud, undue influence, or duress were merely incidental background allegations for context. There is a reasonable chance the trier of fact would find, based on the totality of the evidence, that someone in Dana's position would have believed there was a reasonable likelihood her petition to reform the trust would be granted after an opportunity for further investigation or discovery. The probate court's order granting the petition for removal and surcharge was based in significant part on the order granting the no contest petition. Therefore, both orders must be reversed, and the matter remanded for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### Drafts by Attorney William Eick

In the summer of 2012, Allyne Urick met with attorney William Eick to create an estate plan. Based on their conversations, he provided a draft for her trust in July 2012. At Allyne's death, the trustee would distribute a specific dollar amount of $600,000 to her son Willis and $1,000,000 to a trust for her grandson Trentyn (Dana's son). If Trentyn died before

---

[2] On its own motion, the court takes judicial notice of the published opinion in *Urick v. Urick* (2017) 15 Cal.App.5th 1182 (*Urick I*), as well as the unpublished opinions in *Urick v. Boykin* (Mar. 23, 2020, B295773), *Urick v. Elkins Kalt Weintraub Reuben Gartside, LLP* (Nov. 18, 2021, B310056), and *Urick v. Lewitt* (May 23, 2022, B312238).

age 45, the assets in his trust would be distributed to Philips Academy Andover. The remainder of the assets in Allyne's trust would be distributed to her daughter Dana, or if she predeceased Allyne, to Trentyn's trust.

In August 2012, Eick provided a revised draft. Instead of a specific dollar amount to Willis, the draft provided $2,000,000 to a trust for Willis, from which Willis would receive $5,000 per month. Eick explained that by placing the money in trust, Willis could not give the assets to his wife or their children. He noted that Willis was the designated beneficiary on some of her bank accounts.

In September 2012, at Allyne's request, Eick provided another draft of her estate plan that removed Willis as a beneficiary. Eick sent a draft in October 2012, which also did not provide anything to Willis. Eick noted that because Willis received his share of assets outside of the trust, the no contest provision of the trust would have no effect on his share and there would be no incentive for him to refrain from filing a lawsuit to contest the trust or allege alienation of affection.

**Drafts by Attorney Mark Boykin**

Frustrated with the lengthy planning process, Allyne turned to attorney Mark Boykin to draft her estate plan. In December 2012, Boykin confirmed in a letter that Allyne wanted Willis and Dana to receive a fixed percentage of her estate in the form of an annuity for the rest of their lives, with the remainder to Phillips Academy, and wanted her grandson Trentyn to receive a substantial sum in trust. After hearing Allyne's interest in providing annuity payments to her children for their lifetimes,

Boykin had suggested a charitable remainder annuity trust (CRAT) for the primary gift and a conventional trust for Trentyn. Allyne wanted to reduce potential estate taxes, but was more concerned about providing for her grandson and not having her children receive a large sum of money at her death.

After further research and discussion between them, Boykin confirmed in a letter that Allyne wanted Willis and Dana to receive a fixed amount of five percent per year. She wanted two-thirds of her estate placed in the CRAT and the balance in a trust for Trentyn, to pay for his education and necessities, with the principal distributed at ages 25, 30, and 35. Boykin's analysis of the CRAT demonstrated it would not qualify for charitable treatment under the tax laws, because there was not a sufficient probability of any assets remaining for Phillips Academy after the deaths of Dana and Willis, due to their relatively young ages. As a result, there would be no reduction in estate taxes using a CRAT. Allyne had preferred to use the CRAT approach, although it might not provide tax savings.

Boykin provided her with a draft for the trust in January 2013. He noted that Allyne wanted Willis and Dana to receive an annuity of five percent of her net estate for their lifetimes, with the remainder to Trentyn. A substantial generation skipping transfer tax might be imposed. He added, "You have instructed me that you wish to minimize the taxes imposed upon your estate at your death, but that you[r] desire to provide for Trentyn is to take priority over that concern; accordingly, I have drafted the Trust in such a manner as to carry this out." Although the trust used many technical legal terms to ensure proper interpretation in litigation, he assured her that she did not need to be overly concerned with language other than the distribution provisions.

5

Allyne responded that she wanted Trentyn to have an equal annuity share to her children. Boykin explained that he could not even approximate the tax treatment for such a plan. He would complete the trust as instructed, but warned that giving Trentyn a present annuity interest in addition to the remainder interest could lead to substantial additional taxes.

In February 2013, Boykin provided another revision of the trust based on the CRAT approach, because Allyne decided to name Phillips Academy to receive the remainder, even though the gift would probably not qualify for charitable treatment. He had advised leaving the option open, because tax regulations could change and make it possible for the gift to qualify.

## Execution of the Estate Plan

Allyne executed the Allyne L. Urick Trust on March 8, 2013, at age 89. The trust was structured as a CRAT. Upon Allyne's death, the trust principal would be annuitized and distributed in equal shares to Willis, Dana, and Trentyn. The annuity payments would end upon the earlier of Trentyn reaching age 35 or the death of the last surviving named recipient of a share of the annuity. Dana was approximately 52 years old and Trentyn was nine years old when Allyne executed the trust. Trentyn's distributions were to be held in trust and distributed on a schedule. Upon termination of the annuity, the remainder of the trust assets would be distributed to Phillips Academy. The distribution provision stated, "The Trustor acknowledges that this gift may, but indeed may not, qualify as a Charitable Remainder Trust under the laws and regulations in effect at the time of her death." The trust

6

contained a no contest clause to discourage litigation by beneficiaries or individuals who were specifically not named as beneficiaries.

The trust's primary asset was a 60-unit apartment building held in a joint venture with Lucien Seifert. The building was constructed on real property that had been owned by the Urick family for nearly 100 years. The trustee's powers included the power to retain the original assets in the trust and to continue to retain and operate any business interest that was part of the trust. The trust also provided the trustee, in the trustee's absolute discretion, with the right to take any action to minimize tax liabilities.

Boykin videotaped Allyne's execution of her estate planning documents. Allyne stated that she did not want to leave her estate outright to her two children. Her estate consisted of a large piece of property that was quite valuable and brought in a good income. Boykin noted that her estate was large enough to be subject to federal estate tax, even under the current guidelines. Boykin explained that Dana, Willis, and Trentyn would receive five percent of the trust for the rest of their lives, or until Trentyn reached age 35. They held a conversation off the record and returned to clarify that the beneficiaries would receive five percent of the entire trust each year, split three ways. At that point, Boykin misstated the distribution, saying, "And then that is going to continue until both of your children have passed away and Trentyn attains age 35 years; correct?" Allyne agreed.

Boykin asked where the trust fund would be distributed once Trentyn reached age 35. They held another discussion off the record. Allyne thought she might want to extend the length of time that the annuity would be paid to Trentyn. She added,

"Because if this trust and the assets in the trust should remain as valuable as they are at the present time, meaning the building, of course—it's such an old building anyway—the school would get several million dollars, wouldn't it?" She asked Boykin to estimate how much the remainder would be. Boykin stated that although they discussed the fact that the Internal Revenue Service (IRS) tables showed the remainder going to Philips Academy would be zero, he didn't think the school would actually receive zero. He believed the remainder would probably be somewhere between $3 and $10 million. Allyne responded, "Oh, that's a lot of dough right there." Boykin agreed it was a lot of money, but they had discussed that it needed to go somewhere and this was the plan she came up with that she wanted. Allyne responded, "Well, it was the first thing that I could think of." She decided to leave it as it written for the present, but to give the distribution further consideration. She executed the documents.

In April 2013, Boykin sent correspondence documenting that Allyne had expressed concern again that Trentyn should receive annuity payments until age 45, but after discussing the matter with Boykin, ultimately instructed him to leave the trust as it was, with distribution of the annuity to Trentyn terminating at age 35.

On January 3, 2014, in a handwritten note, Allyne removed Willis as a beneficiary of her trust. Boykin prepared trust amendments that eliminated Willis as a beneficiary.

**Operative Restated Trust**

On August 6, 2014, Allyne executed a full restatement of the trust. Like the original, the restated trust continued to be

structured as a CRAT and provided annuity payments in equal shares to Willis, Dana, and Trentyn. The restatement provided, however, that annuity payments would end on the earliest of Trentyn reaching age 35, the death of the last named recipient of a share, "or upon the latest date allowed by Internal Revenue Code §[ ]664." Although not specified in the document, the latest date allowed by the Internal Revenue Code was 20 years. The distribution provisions stated: "The Trustor acknowledges that this gift may, but indeed may not, qualify as a Charitable Remainder Trust under the laws and regulations in effect at the time of her death due to the value of the annuity interest, or other reasons, but desires that it so qualify."

The restated trust continued to have a no contest clause providing: "In the event that any Beneficiary or other individual who is specifically not named as a Beneficiary, including grandchildren or spouses of the Trustor's children, shall contest any aspect of this Trust or attempt to set aside, nullify, or void the Trust or the distribution thereof in any way, whether successfully or unsuccessfully, then the Trustor directs that such rights of such person shall be ascertained as it would have been determined had that person predeceased the execution of this instrument without living issue."

The restated trust continued to give the trustee "the power to retain, without liability for loss or depreciation resulting from such retention, the original assets and all other property hereafter transferred . . . to the Trustee, although such property may not be of the character prescribed by law or by the terms of this instrument for the investment of other Trust assets; and, although it represents a large percentage or all of the Trust Estate, this said original property may accordingly be held as a

permanent investment." The trustee continued to have the power to retain and operate any business interest that became part of the trust estate. The trust also continued to provide the trustee with the power, in the trustee's absolute discretion, "to take any action and to make any election to minimize the tax liabilities of this Trust and its Beneficiaries and to allocate the benefits among the various Beneficiaries and to make adjustments in the rights of any Beneficiaries or between the income and principal accounts, to compensate for the consequence of any tax election."

Miscellaneous provisions related to the CRAT were inserted at the end of the document. One of the new provisions stated, "The operation of the Trust shall be governed by the laws of the State of California. However, the Trustee is prohibited from exercising any power or discretion granted under said laws that would [be] inconsistent with the qualification of the Trust as a charitable remainder annuity trust under [Probate Code section 664, subdivision (d)(1)] and the corresponding regulations, unless the Trust has been previously determined not to qualify thereunder." In addition, it provided, "The Distribution Trust will be irrevocable. However, the Trustee shall have the power, acting alone, to amend the Trust from time to time in any manner required for the sole purpose of ensuring that the Trust qualifies and continues to qualify as a charitable remainder annuity trust within the meaning of [Probate Code section 664, subdivision (d)(1)], unless it has been previously determined not to qualify thereunder."

In contrast with the creation of Allyne's original estate plan, Boykin did not correspond with Allyne in writing prior to execution of the restated trust. He did not videotape her

10

execution of the restated trust. His letter transmitting a copy to her contained no explanation of the contents of the restated trust or the reasons for its execution. He did not correspond with her again about her estate plan.

When Allyne passed away in 2015, Dana was appointed as the successor trustee. Trentyn was 12 years old at the time of Allyne's death.

## Petition to Reform the Trust

Attorney Kira Masteller filed a petition on February 16, 2016, to reform the trust under the provisions of Probate Code sections 17200 (the reformation petition). The attorney caption and the attorney signature block stated simply, "Attorneys for Dana Urick." The petition began, "Petitioner, Dana Urick, Trustee of The Allyne L. Urick Trust, herein hereby seeks to reform the Allyne L. Urick Trust" on the grounds that it was not drafted in accordance with Allyne's intent, the stated terms were misrepresented by the drafter, Allyne had mistakenly signed the trust believing it reflected her intent, and the trust did not contain the distribution plan that Allyne requested of the drafting attorney.

Among other defects, the reformation petition alleged that a CRAT was not an appropriate vehicle for the estate plan, considering Allyne's desired distribution and the nature of her assets. As written, the CRAT was unworkable and would incur substantial unnecessary taxes. In addition, prior to executing the full restatement of her trust, Allyne handwrote an amendment disinheriting Willis, and her attorney prepared several draft

amendments providing solely for Dana and Trentyn upon her death.

The petition noted that mistake of law is a ground for reformation under Civil Code sections 1578, and a written instrument may be reformed on the application of an aggrieved party under Civil Code section 3399. Dana proposed to reform the trust to correctly state the trustor's intent as follows: After distributing specific bequests and personal property, the remaining principal would be divided into two shares, with one share for Dana and one for Trentyn. The assets would be held in trust for 10 years, then distributed outright to Dana and Trentyn. If no beneficiaries survived, the assets would be distributed in equal shares to four charitable institutions that had been consistently named as recipients of charitable bequests in versions of Allyne's estate plan, one of which was Phillips Academy.

The proposed reformation eliminated Willis's interest in the trust and substantially reduced the likelihood that Phillips Academy would receive any assets from the trust. Dana attached Allyne's correspondence, prior estate documents, and unexecuted drafts of estate plans. She signed a verification of the reformation petition that did not state whether she was signing in her role as trustee.

Willis and Phillips Academy each objected to the reformation petition.

**Petitions Filed by Willis**

In May 2016, Willis filed a petition for instructions as to whether the reformation petition violated the no contest clause of

the trust (the no contest petition). He argued that the reformation petition was based on allegations of duress, fraud, and undue influence. He sought instructions from the court as to whether Dana lacked probable cause to file the reformation petition, and if so, whether she and her issue should not receive her interest under the trust in accordance with the no contest provision.

Willis also filed a petition to remove Dana as trustee, surcharge her for breach of trust, reimburse the trust for attorney fees and costs, and compel an accounting (the removal petition). The removal petition argued that Dana breached her fiduciary duties owed to the beneficiaries of the trust by filing a reformation petition to exclude named beneficiaries and by taking the position that the trust did not satisfy the requirements for a CRAT.

Among the exhibits that Willis attached to the removal petition was a letter from attorney Masteller dated October 6, 2015, stating that she represented Dana as trustee of the trust. Masteller provided a copy of the trust, but stated that the trust as drafted failed as a CRAT, and significant concerns existed about Allyne's intent compared to the actual document. She copied "Dana Urick, Trustee" on the letter.

Willis also filed a petition for an order conforming the charitable remainder annuity trust (the CRAT petition). He requested the probate court amend and reform the trust to be a CRAT, so that as of the date of Allyne's death, it qualified for the federal estate tax charitable deduction. In addition, he sought instructions to the trustee to distribute the annuity for a term of 20 years or such term that the court deemed proper. He alleged that the trust established a CRAT on Allyne's death, and that

Allyne's intent was clear and unambiguous that the CRAT would qualify for the estate tax deduction. He alleged that the trustee was prohibited by law from taking actions that impair the charitable deduction and had a duty to administer the trust according to its terms, including taking steps necessary to qualify the trust as a CRAT within the meaning of the Internal Revenue Code.

Willis alleged that additional mandatory operating provisions and an alternate charitable remainderman needed to be added for the trust to qualify as a CRAT. Willis argued that the trust otherwise qualified for the charitable deduction. In particular, the term of the annuity was saved by the language of the distribution provision. A CRAT may only make annuity payments to a "person" for a term of 20 years or less, but can make distributions to an individual for life. Because Trentyn's share was paid to a trust administered for his benefit, the CRAT must be limited to a term of years not exceeding 20 years. The distribution provisions of the trust required payments to cease upon the latest date allowed by the Internal Revenue Code, so the term could not fail. Willis asked the court to instruct the trustee that the term of the CRAT is 20 years, which was the maximum period allowed under the Internal Revenue Code to be sure the trust qualified for the charitable deduction.

Willis acknowledged that Dana's competing reformation petition attempted to eliminate the CRAT, despite the saving language limiting the term to the maximum allowed by law. Under the applicable tax code provisions, the value of the remainder interest must be at least 10 percent of the net fair market value of all property placed in the trust, so the annuity term cannot be so long as to exhaust the remainder interest and

14

cause it to be less than 10 percent of the initial net fair market value at the inception of the trust. Calculations attached to the petition showed the CRAT could make annuity payments for 20 years without coming near the 10 percent remainder threshold. The CRAT petition alleged that due to the drafting errors, the trust did not currently qualify as a CRAT, and therefore, the amendments must be retroactive to before Allyne's death.

Dana, as trustee, opposed the CRAT petition. She noted that her reformation petition and the competing CRAT petition agreed the trust as drafted did not meet the requirements of a valid CRAT. She argued that Willis's CRAT petition altered the distribution even farther from Allyne's intent and was inappropriate for the assets in the trust. The purpose of reformation was to salvage the trustor's intent; distorting the terms of the distribution trust to limit payments to a maximum term of 20 years would eviscerate Allyne's intent to leave the majority of her estate to the annuity beneficiaries.

## Anti-SLAPP Motion and Appeal

Dana, as trustee, filed a motion to strike Willis's no contest petition under Code of Civil Procedure section 425.16 (the anti-SLAPP statute). The motion argued that the no contest petition should be stricken because: (1) the provision could not be enforced against Dana's interest as a beneficiary based on a pleading that she filed in her capacity as trustee; (2) the reformation petition was not a direct contest, because it did not seek to invalidate the trust and was brought on the ground of mistake, not duress, fraud, or undue influence; and (3) Dana had

15

probable cause to believe the requested relief would be granted after an opportunity for further investigation and discovery.

Willis opposed the anti-SLAPP motion. He argued that no contest petitions were not subject to the anti-SLAPP statute. Even if they were, based on references to "Dana Urick" in the petition and the verification, he argued that Dana brought the reformation petition in her individual capacity, not as trustee of the trust. Relying on isolated allegations , he argued the reformation petition was not brought solely on grounds of mistake, but also on grounds of undue influence, fraud, and duress. Lastly, he argued that Dana had no probable cause to believe the reformation petition would be granted, based on the evidence that Willis was an intended beneficiary of all Allyne's prior estate plans.

Willis submitted Boykin's declaration as to the following. In January 2014, Allyne said she wanted to remove Willis as a beneficiary and leave her estate to Dana, Trentyn, and ultimately Phillips Academy. Boykin met with her in March 2014, and she executed an amendment removing Willis from the trust. On April 1, 2014, she called and said that she had reconsidered eliminating Willis. She wanted to revert to the trust that she originally signed. Boykin met with Allyne that night. She wrote "revoked" on the amendment and tore it up. She allowed him to keep a copy, which he attached to his declaration. She asked that Willis not be made aware of her actions to exclude him from the trust.

Boykin met with Allyne in August 2014. She appeared irritated or resentful that Willis might be seeking a conservatorship over her and asked about removing him from the trust. Boykin explained that Willis would challenge the trust if

he had nothing to lose, but a challenge would be avoided if she kept him as a beneficiary of one-third of the annuity payment. She agreed Willis should continue to be a beneficiary. To avoid any doubt, Boykin prepared the restated trust, which Allyne executed in his presence. After that, she did not contact Boykin again to request any action to remove Willis as a beneficiary of the trust.

Dana filed a reply arguing that as trustee, she had authority to petition for reformation of the trust, and the petition stated in the very first sentence that the petitioner was the trustee of the trust. Although Willis argued the allegations may support causes of action for duress, fraud and undue influence, Dana had not challenged the trust on any of the asserted grounds and the petition was not a direct contest. The evidence that she had would lead a reasonable person to believe the reformation petition would be granted after an opportunity for further investigation and discovery.

Judge Lesley C. Green heard argument, reviewed the pleadings and the evidence, and granted the anti-SLAPP motion. The court found the anti-SLAPP statute applied, because the no contest petition was based on protected litigation conduct. The reformation petition was not a direct contest, however, because the petition was brought in Dana's capacity as trustee, not as a beneficiary, and the grounds for seeking reformation did not fit into any of the categories required for a direct contest. The court noted that simply because the factual scenario alleged in the petition could support a claim for fraud did not make it a direct contest under the Probate Code. In the court's assessment, Willis had not made even the minimal showing necessary to substantiate a legally sufficient claim. The court struck the no

contest petition, and Willis filed an appeal from the order denying his anti-SLAPP motion.

In October 2017, another panel of this appellate court reversed the order denying the anti-SLAPP motion. (*Urick I*, *supra*, 15 Cal.App.5th 1182, 1186.) We agreed the no contest petition was litigation activity protected by the anti-SLAPP statute. We concluded, however, that Willis had demonstrated the minimal merit necessary to proceed to trial on his petition. He had shown a reasonable probability of prevailing if the trier of fact credited his evidence and arguments. Dana provided conflicting evidence and arguments as to each point, from which the trier of fact could find that she filed the reformation petition in her capacity as a trustee, the petition was brought on the basis of mistake alone, and Dana had a reasonable basis to believe the petition would be reformed, but Dana's evidence did not conclusively establish any of those facts as a matter of law, and therefore, the anti-SLAPP motion had to be denied. (*Urick I*, *supra*, 15 Cal.App.5th at pp. 1196–1198.)

## Additional Litigation on Behalf of the Trust, Amended Reformation Petitions, and Suspension of Trustee

Dana, as trustee, elected to dissolve the joint venture and exercised an option to buy out Seifert's interest in the apartment building, but the purchase was not completed. In November 2017, attorney Boykin filed a lawsuit on behalf of Seifert to enforce the buyout against Dana as trustee. Dana, as trustee, filed a cross-complaint against Seifert to enforce the buyout against Seifert (collectively the Seifert litigation). Ultimately,

18

the trial court disqualified Boykin from further representing Seifert based on his conflict of interest.

In February 2018, Dana, as trustee, filed an action for professional negligence against Boykin. The trial court found the statute of limitations had started to run when Dana filed her reformation petition, more than one year before she filed the malpractice action, and therefore, the action was barred by the one-year statute of limitations. Dana appealed the trial court's ruling. In an unpublished case, this appellate court reversed, finding that Dana should have been granted leave to amend to allege that a tolling agreement with Boykin extended the statute of limitations. (*Urick v. Boykin*, *supra*, B295773.)

With the assistance of new law firms, Dana, as trustee, filed an amended petition for reformation of the trust in May 2018. In support of the amended petition, she filed the declaration of attorney Masteller. Masteller declared that her law firm represented Dana only in her capacity as trustee. The firm was not retained by, and never at any point represented, Dana in her individual capacity as a beneficiary. In fact, Dana was represented in her individual capacity as a beneficiary by independent counsel.

Specifically, Masteller served as counsel for Dana in her capacity as trustee in connection with the February 16, 2016 reformation petition. The first sentence of the February 16, 2016 reformation petition showed Masteller filed the petition for Dana as trustee by stating, "Petitioner, Dana Urick, Trustee of the Allyne L. Urick Trust, herein hereby seeks to reform the Allyne L. Urick Trust." Masteller's intent in drafting the first sentence of the petition was to define the petitioner as "Dana Urick, Trustee of the Allyne L. Urick Trust." The petition never

19

stated that it was brought by Dana as an individual, and the firm did not represent Dana as an individual. References to Dana in the attorney caption, signature block, and verification did not repeat that it was brought in her capacity as trustee, but the omission was inadvertent, because the firm represented Dana only as trustee. In the petition, Masteller referred to Civil Code section 3399 for the proposition that a written instrument may be reformed by the aggrieved party. In Masteller's analysis, Allyne was the aggrieved party as a result of the incorrectly drafted trust, and the successor trustee Dana brought the action to reform the trust to reflect Allyne's wishes. Masteller acknowledged, however, that the reference to Civil Code 3399 might not have been the clearest use of the citation.

Dana subsequently filed a second amended petition for reformation of the trust in July 2018. In August 2018, Phillips Academy joined in Willis's no contest petition. Willis filed an amended no contest petition in October 2018, and a supplement to the amended petition in January 2019. Dana filed objections to the amended no contest petition and the supplement.

On the first day of trial on the reformation petition in July 2019, the probate court made preliminary comments and Dana withdrew the second amended petition for reformation. The probate court dismissed the petition without prejudice.

On July 16, 2019, Willis filed a petition to suspend Dana's powers as trustee and appoint interim successor co-trustees. On October 25, 2019, Judge David J. Cowan granted Willis's petition for an order conforming the CRAT. On January 23, 2020, Judge Cowan granted Willis's request in the trust proceedings to suspend Dana as trustee and appointed interim successor trustees.

## Preliminary Offer of Proof

On January 10, 2020, at the probate court's request, Dana submitted a preliminary summary of legal issues and evidentiary offer of proof. She noted that Willis had the burden of proof at trial. She provided an extensive list of witnesses. Masteller would confirm her deposition testimony in which she unequivocally testified that Dana filed the 2016 reformation petition in her capacity as trustee. In addition, Dana would testify that she intended and understood that she filed the reformation petition in her capacity as trustee.

Dana's expert witness would testify about the requirements for a trust instrument to qualify as a CRAT, the remedies for a trust that is not drafted to qualify as a CRAT, and the appropriate use of a CRAT in an estate plan. Dana also anticipated calling Boykin as a hostile witness. Among other points, his testimony would demonstrate a lack of understanding of the technical requirements of a CRAT, which resulted in a trust instrument that did not qualify as a CRAT.

Other witnesses would testify to their personal knowledge that Allyne paid for Trentyn's private school education and set up a college fund for him. In addition to witness testimony, Dana would present extensive documentary evidence, including the transcription of Allyne's videotaped execution of the 2013 trust instrument and the drafts of testamentary documents eliminating Willis as a beneficiary.

She included a portion of her deposition testimony. She had been a practicing lawyer since 1988, primarily in family law for the past 10 years. She brought the reformation petition in her capacity as trustee, as stated in the body of the petition.

In her deposition, Dana explained that Allyne repeatedly told her the trust assets would provide for Dana for her lifetime. Dana's understanding of the trust that was drafted, however, was that the bulk of the estate went to Phillips Academy, and not at the end of Dana's or Trentyn's lifetimes, but after a period of years. Allyne had also told Dana that money was there for whatever Trentyn needed. Allyne had paid for Trentyn's private school tuition, saying it was her privilege to do so. Dana's understanding of the trust that Boykin drafted, however, was that it did not allow Trentyn's share to be accessed at all until he was age 25, which contradicted what her mother had always expressed that she wanted for Trentyn. If the trust did not allow the money for Trentyn to be used for his school tuition, there was an error in the drafting, based on everything that Allyne had ever said she wanted for Trentyn.

Dana's understanding was that the trustee, on behalf of the trust, was aggrieved and had an obligation to bring to the court's attention that the trust was not drafted in accordance with the testator's wishes. Her understanding was also that, as drafted, the trust did not qualify for the tax relief that Boykin referred to in correspondence with Allyne.

She had no knowledge of making an allegation of fraud in the reformation petition. She relied on her counsel to draft the trust and tax provisions of the proposed reformation in accordance with her mother's intent, but aside from that, she believed the proposed trust reformation accurately set forth her mother's testamentary intent.

Allyne had a serious heart attack in March 2014. Dana was asked about text messages that she wrote to Willis's wife expressing frustration with Allyne's behavior during this period

of her life. The portrait of Allyne that emerged was a mother who was demanding, controlling, anxious, easily slighted, and punitive. Dana did not tell her mother in advance about a vacation that she was taking with her family for fear of her mother's emotional manipulation. Dana visited and cared for Allyne every week, as Allyne preferred, despite having her own family and business, and Trentyn's schoolwork suffered due to all the late nights at Allyne's house and the hospital.

Dana testified about multiple conversations that she had with her mother on different occasions over a period of many years in which her mother insisted that Dana honor her wishes and ensure her brother did not receive anything from the estate. Her mother was very hurt that Willis and his third wife had big family holiday celebrations that Allyne was never included in and heard about later. Willis had stepchildren that Allyne had never met. Allyne told Dana that she had taken steps to disinherit Willis. At one point, Allyne had considered giving Willis a specific amount of money, but decided not to, because she did not want Willis to receive anything. A few days before her death, Alleyne told Dana that her lawyer had the documents, and Willis was going to fight Dana, but Dana must honor her wishes and ensure Willis got nothing. When Dana reviewed the trust document for the first time about a month after her mother's death and learned her brother had an interest as a beneficiary, her initial reaction was confusion, because it was contrary to what her mother told Dana that she wanted.

As trustee, Dana paid the remaining contract for Trentyn's education and advanced funds against Trentyn's share of the estate for tuition and educational expenses. She paid herself between $20,000 and $22,000 per month as trustee's fees.

Dana submitted Eick's deposition testimony. Eick met with, corresponded, and prepared drafts of estate plans for Allyne over the course of several months before she turned to Boykin for estate planning services. Eick's notes from their conversations reflect that Allyne said Willis was financially secure, a successful professional, and had plenty of money. He married a third time and had stepchildren that Allyne had never met. Allyne was concerned Willis would leave his assets to his wife, and Allyne did not want her assets to go to Willis's wife or the wife's children. Allyne said her son and daughter did not get along and had different views about selling property.

Eick explained to Allyne that if a particular person does not receive anything under the trust, there is no incentive for the person not to contest the trust. Even if she did not want to leave assets to a person, it was better to leave them something so that the person has something to lose by contesting the document, rather than to leave the person nothing. Allyne was going to provide Willis with $600,000 as a disincentive from contesting the trust. Allyne consistently expressed that she wanted to make sure her daughter got most of her money and her son really did not get anything except a relatively small amount of money to discourage him from contesting the estate plan. She wanted to leave almost everything to her daughter and not her son.

At one point, Allyne told Eick that she changed her mind and did not want Willis to have any assets from the trust. She wanted to effectively disinherit him. Eick removed Willis as a beneficiary from the next draft. Allyne did not want Willis to be a trustee, because she was concerned that he would know rules that Dana did not know and would not treat his sister fairly.

Dana submitted Boykin's deposition testimony. Boykin explained that a CRAT pays a fixed percentage to certain individual beneficiaries, which must be at least five percent of the value of the trust corpus at the creation of the trust, and in no more than 20 years, passes the remainder to charity. The tax benefit of a CRAT is the deduction on the estate tax return for the present value of the remainder to the charity.

Boykin did not employ a secretary, administrative assistant or paralegal during the time that he represented Allyne. He also did not have errors and omissions malpractice insurance. Boykin had completed a CRAT for one client prior to drafting Allyne's estate plan, although he had helped to administer several more. He was subsequently sued for legal malpractice by the other client's estate with respect to the CRAT that he drafted. Boykin's standard fee to draft a trust was between $1,000 and $2,500, but he charged $5,000 for a CRAT.

When Boykin first met with Allyne to discuss her estate plan, she was adamant that she did not want the beneficiaries to receive a large amount at one time. She wanted the beneficiaries to get annuity payments for their lifetimes and anything left after their deaths would go to Philips Academy. She wanted Trentyn's annuity to be paid until he was 35 years old, but Boykin knew there was a limited period of 20 years duration for a CRAT. He told her that her goal of providing an annuity for three family members with any remainder to Philips Academy was very close to a CRAT, except that she wanted Trentyn to receive distributions until age 35. He recognized that a CRAT did not exactly match the distribution that she wanted. He told her that if she could be flexible about the end date for Trentyn's annuity payments, then she would be able to use a CRAT.

Boykin did not calculate the tax savings or tax benefit of a 20-year CRAT, because Allyne was more interested in who was getting distributions than in how much it would save in taxes. Tax deductions and tax savings were a secondary consideration. Allyne was clear that the tax objectives were secondary in her mind to the distribution scheme. She would rather pay less in taxes, but it was more important to her to get money to Trentyn.

Boykin found the form that he used for the CRAT on the internet after looking at six or eight sites. He believed that he was drafting a 20-year CRAT. He drafted the CRAT to continue for the maximum time allowed, which was 20 years. If Trentyn was 12 years old when Allyne died, the annuity would cease when he was 32 years old, and that was okay with her.

In his first meeting with Allyne, before he knew about her interest in the apartment building, he explained that a trustee would liquidate the assets of the estate. Although he did not discuss using a CRAT in that meeting, he thought she understood that her estate would be liquidated for the CRAT. He never discussed liquidation with her again. Boykin did not think about the tax treatment failing if the trustee kept the apartment building in the CRAT, because he assumed everything would be liquidated, even though he knew the property had been in the family for a very long time.

Boykin entered the amount of the annuity, the percentage of the annuity, and the terms of the trust in an IRS calculator on the internet. The calculator stated the remainder value was zero, and therefore, the trust did not qualify as a CRAT. In Boykin's experience, even though a plan did not pass on the IRS calculator, the CRAT would be approved by the IRS on the estate tax return. He believed the remainder for Philips Academy, in

26

his experience, would be 20 percent of the amount in the trust at the time it was created. He advised Allyne that the website calculator said the remainder would be zero, but in his experience, it would be more like $3,000,000. He limited the annuity to 20 years, even though the IRS calculator showed the trust would not qualify as a CRAT, because the IRS calculator had been wrong before and he was confident it would qualify. The trust that he drafted accomplished Allyne's distribution objectives, even if it did not receive the charitable tax benefit it would otherwise be entitled to.

After executing the trust, Allyne had Boykin draft an amendment to disinherit Willis, because she said Willis had it too easy, made plenty of money on his own, had two daughters who did not pay any attention to Allyne, and had too many young people freeloading off him in his home. She was adamant that Willis's wife not receive any of her money.

Boykin stopped writing letters to Dana after she told him that someone went into her desk and took her documents. Instead, Boykin took extensive notes about their conversations on his computer, which he saved to keep a record. The computer with his notes crashed. His data was recovered from the cloud, but due to transferring the data back from the cloud, he does not know what the data would indicate about when it was entered or stored.

In reviewing his previous declaration about the circumstances surrounding restatement of the trust, Boykin explained that Allyne said Willis would object to any treatment different from his sister. Boykin mentioned leaving Willis a specific dollar amount instead of an annuity interest, but Allyne said no amount of money that she could leave Willis would stop

27

him from contesting the document if it was different from Dana's share. Allyne said not to repeat her comments about Willis unless Boykin was forced to do so.

In April 2016, Willis's attorney called Boykin to say that Dana had filed a reformation petition accusing Boykin of nothing less than malpractice. Willis's attorney sought a tolling agreement from Boykin for a malpractice claim on behalf of Willis. Otherwise, he would be forced to sue Boykin to preserve the statute of limitations, even though it was too early to determine whether he had a claim. Boykin signed a tolling agreement, which is still in effect.

Dana also provided deposition testimony and background information for her expert witnesses.

## Litigation Against Former Counsel

In March 2020, Dana filed a complaint against Masteller and her law firm on the ground that they failed to advise Dana of fiduciary duties as trustee or inform her that the reformation petition could violate those duties. The trial court sustained a demurrer to the complaint on the ground that Dana suffered actual injury in October 2017 when *Urick I* was issued and she incurred attorney fees to defend her actions in filing the reformation petition, rather than when she was suspended as trustee in January 2020. As a result, her malpractice complaint was barred by the one-year statute of limitations. In an unpublished case, Division Four of this appellate court affirmed the lower court's decision. (*Urick v. Lewitt*, *supra*, B312238.)

On May 7, 2020, Dana filed a malpractice complaint on behalf of herself as the former trustee, as a third-party

28

beneficiary, and as guardian ad litem for Trentyn, against some of the attorneys who provided legal services to her in her capacity as trustee which could result in her being disinherited, removed as trustee, and surcharged personally in the pending probate litigation. The attorneys filed an anti-SLAPP motion, which the lower court denied. Division Two of this appellate court affirmed the lower court in an unpublished opinion. (*Urick v. Elkins Kalt Weintraub Reuben Gartside, LLP*, *supra*, B310056.)

## Request for Continuance

Trial was set to begin on Willis's no contest petition and his removal petition on Monday, May 17, 2021, before Judge Paul T. Suzuki. On May 10, 2021, Dana's trial counsel, James Bohm, advised the attorneys for the other parties that he was in the hospital with a medical emergency. He would not be able to try the case and needed a continuance.

Bohm's associate Cynthia Beek appeared at a hearing on motions in limine on Thursday, May 13, 2021, to inform the probate court that Bohm had two emergency surgeries over the past weekend and had just been released from the hospital. He had major surgery, lost half his blood, and received blood transfusions. He was recovering on strict bed rest. His doctor said he is not supposed to engage anything strenuous, including trial work, for 30 to 60 days.

The court responded, "If I continue this case, it's going to go to 2023, in February. You're talking about almost two years from now. I blocked out almost five weeks for this trial." Willis's counsel objected to a continuance. Phillips Academy's counsel was sympathetic, but ready for trial. A continuance for two years

would cause a lot of structural problems. Willis's counsel stated that Beek had been heavily involved in the case drafting paperwork, so was eminently qualified to step in for Bohm. He shared the biographies for Beek and other colleagues on the law firm's website. Beek had "a wide breadth of experience assisting clients in a variety of areas of law, including trust litigation," "is well-versed in all phases of litigation," and "assisted clients in complex multimillion dollar trust litigation, at both the trial court and appellate level."

Beek responded that some of the lawyers perform transactional work and very few of the trial attorneys do probate work. She added, "As for myself, I've never even attended a trial, let alone tried a case. So, it wouldn't be me. We simply will not have a trial attorney to go forward." She stated that the law firm would file a motion and get a declaration from Bohm's doctor, if the probate court needed to see paperwork. "But[ ] frankly, I don't know what—you know, we don't have anybody who's familiar with this case to go forward as trial counsel come Monday."

The court continued the hearing on the motions in limine to Monday, May 17, and offered to continue the trial two days to Wednesday to allow Beek to get ready for trial or someone from her office to assist her. The court stated, "I am sympathetic with Mr. Bohm's medical condition, and normally I'm very, very generous with providing continuances, but I think that all the parties are in a very difficult situation because there's a possibility that there might be a five-year violation if I continue it to 2023 and that this litigation has been going on for a long period of time, and I do not see any other time that I can cutout prior to 2023." The court added that Bohm's health was

30

important, "but we have so many parties here who have been waiting, and since the law firm does have 16 attorneys, I'm not going to parse out who's the litigation attorney and who's the transactional attorney. As far as I'm concerned, they're all attorneys licensed to practice law and they can come to court. But I will give a couple more days so that whoever is going to do this can get prepared for it."

Beek reiterated her request for a continuance. She argued the five-year deadline was not in jeopardy, because Willis had appealed the order striking the no contest petition and the matter was stayed on appeal for a year, and after that, the shutdown for the COVID pandemic further continued the limitation period. She noted that Willis's attorneys had requested a continuance just a few months earlier. The matter was very complex and the firm did not have attorneys who could get up to speed over the weekend. Dana selected Bohm as her trial counsel, and his emergency came on suddenly. He thought he was going to the doctor about an ear infection, because he was very dizzy, and the doctor told him to go to the hospital. Beek had been unable to appear any earlier in the week to inform the court, because she was on the east coast where her grandfather was in the hospital, and she had not been expecting to be involved in the trial. The court did not change its ruling denying a continuance.

On May 14, 2021, Dana, individually and as the suspended trustee, filed an ex parte application to continue the trial. Her trial counsel Bohm had suffered a sudden, life-threatening medical condition that required emergency hospitalization, two emergency surgeries, and blood transfusions to address internal bleeding. He had been hospitalized for five days. He was unable,

medically, to proceed on the scheduled trial date. His physicians placed him on strict bedrest for a week and ordered him not to engage in any stressful activities, such as trial, for a minimum of 30 to 60 days to ensure his full recovery. She requested a 60-day continuance of the trial. She noted that she had not previously requested a continuance in the matter.

She asserted that Bohm was the only attorney qualified and prepared to try the case. Beek, who assisted Bohm with some tasks in the case, had never been to trial, even as a second chair, and never even attended a civil or probate trial. No other attorneys at Bohm's firm had been involved in the proceedings or had knowledge of the issues in the case.

The matters had been actively litigated for multiple years and the potential financial impact was very high. Dana selected Bohm for his trust litigation expertise and extensive complex trial experience. At Dana's individual expense, Bohm had spent more than 300 hours preparing for trial. No other attorney could adequately represent her with 48 hours of preparation.

Dana attached Bohm's declaration providing the details of his condition, his preparation for trial, and the inability to substitute another attorney from his firm. She provided her own declaration. In addition, she attached the declaration of Bohm's primary care physician providing the details of his treatment and his medical opinion that Bohm required a week of strict bed rest. After a week of bed rest, Bohm could return to light work, but in the doctor's opinion should not engage in the stress of trial until his blood levels returned to normal in 30 to 60 days. Failure to follow the doctor's instructions, in his opinion, would place Bohm's health in jeopardy.

Willis opposed the request for a continuance. He argued that another lawyer in Bohm's firm could represent Dana at trial. Willis would be prejudiced if the trial was continued, because the court could not reset the trial until 2023, and Willis had expended $200,000 for trial preparation that he should not be forced to incur again. Willis attached the biographies for every attorney in Bohm's law firm and information on the firm's practice areas from their website. He also attached local rules requiring an application for continuance of trial to be filed no less than one week prior to trial.

A hearing was held on the application for a continuance on May 17, 2021. Beek appeared for Bohm on behalf of Dana. The court stated that it was a very hard decision, because the court was very sympathetic to Bohm's situation, but the court was also sympathetic to the amount of fees spent in preparation for trial by Willis and other counsel. The court thought there was a possibility that Beek would step in, at least temporarily, if the court denied the continuance. The court also considered that other attorneys at Bohm's firm had experience in probate law. Many trials were delayed throughout the court due to the pandemic, so parties in other cases were frustrated. As soon as the probate court began holding trials again in November 2020, the court had been engaged in back-to-back trials. Judge Suzuki had allocated more than one month for the Urick matters, and if the case were continued, the court would remain idle for four weeks. If the court could continue the case without harming other litigants, the court would do so. But it was a significant imposition to the court to be idle for a month and continue the case to 2023.

In addition, Dana had used at least five or six other law firms in the past, half of which she had sued for malpractice. The court had to weigh all the interests. Technically, local rules stated a continuance had to be requested within one week before trial, so a continuance should be denied based on that alone. Upon weighing the interests, the court reached the difficult decision to deny the continuance.

Beek responded that the firm would not have any attorney ready to go to trial on Wednesday. She suggested using a judge pro tem or private judge. She noted Dana had incurred as much in attorney fees to allow Bohm to prepare for trial as the other parties had incurred for their attorneys. Bohm prepared more than 300 hours for the trial. There was no way any other attorney could be prepared to adequately represent Dana in two days. She also noted that there had been multiple judges in the proceeding over the course of five years.

Willis's counsel responded that sending the matter out to another judge was not an acceptable solution. Judge Suzuki was the fifth judge on the case, and to expect another judge to get up to speed for this case was an unreasonable request. It would prejudice every party and was not a reasonable solution. He appreciated the concern and the seriousness in which the court had weighed the equities, it was a difficult situation for everyone, but he saw no other solution other than to move forward.

Phillips Academy's counsel stated again that he was torn. The "reality here is that there is a horrible burden that is going to have to be visited upon someone here. And, in my analysis, given the number of counsel that Ms. Urick has had over the period, given the fact that when it comes to balancing the relative equities of the parties, one of the parties here to this trial is a

now suspended for cause fiduciary. Where the burden must be visited is, unfortunately, on Ms. Urick." He noted that Dana was a licensed attorney, although not a trust litigator.

Beek responded that the argument about the prejudice caused by involving another judge was an acknowledgement of the complexity of the case. Trentyn's attorney noted that if the trial went forward and it led to Dana's default, then there would simply be a motion for relief from default. He did not see a way to move forward with the trial as scheduled. He urged the parties to attempt mediation again, but otherwise, 30 to 60 days was an opportunity for a judge pro tem to get up to speed on the matter.

Willis's attorney replied, "Let me answer [Trentyn's attorney] directly in terms of what happens with the default. We go right from a default into a prove-up. And I intend to proceed with the prove-up should Dana not appear pursuant to the notice to attend trial." He did not think sending the matter out for 30 or 60 days was a reasonable solution. He also argued that Dana had 14 attorneys in the matter, five or six of which had been sued for malpractice. "So I just say that to set the record straight in terms of any empathy that might otherwise befall Ms. Urick's position." He also stated that it would be an uncontested trial, not a default.

The court stated that it did not construe the situation as a default hearing. It would be a trial. The court found Dana should bear the consequences of not going forward with the trial and denied the application for a continuance. The trial court heard argument and ruled on the motions in limine.

Dana filed a writ petition seeking a stay of the trial, which this appellate court denied on the ground that she had an adequate remedy by way of appeal from any adverse judgment.

Trial began on May 19, 2021. Two attorneys from another law firm appeared on behalf of Bohm, Beek, and their law firm. There was no appearance for Dana. The attorneys on Bohm's behalf presented information from Bohm's doctor about his condition, argued Bohm was the only individual who could try the case on Dana's behalf, represented that Bohm had never been in such a dire situation in their long history with him, fell on the mercy of the court, and again requested a continuance of the trial. The court interpreted the argument as a motion to reconsider the court's ruling. The court stated that it was the only long cause probate court, the matter could not be heard by any other judge, and because of the COVID pandemic, the court was backed up. The court denied the motion for reconsideration of a continuance, even a continuance of two weeks. The court expressed a lack of confidence that the case would even finish within the time originally estimated by the parties. The attorneys for Bohm, Beek, and the law firm concluded their participation and left the hearing.

**Trial**

Trial was held on the no contest petition. The probate court granted Phillips Academy's motion for evidentiary or terminating sanctions or an order striking Dana's objection to the no-contest petition, in light of her failure to appear at trial under Probate Code section 17206. Willis noted that the trustee was prohibited from exercising any power or discretion granted under

36

California law that would be inconsistent with qualification of the trust as a CRAT under Probate Code section 664. The trustee also had the power to amend the trust as required to ensure the trust qualified and continued to qualify as a CRAT, unless it had been previously determined not to qualify.

Willis discussed the differences between the restated trust and Dana's proposed reformation. He noted all of the features of the reformation petition that suggested the petition was brought by Dana as a beneficiary. Willis did not provide any extrinsic evidence, however, to support finding that Dana filed the reformation petition as a beneficiary. Willis argued the reformation petition was based on undue influence, fraud, and duress, based on selected allegations. Willis introduced Dana's amended reformation petitions as circumstantial evidence that she had no probable cause to file the original petition, because her subsequent petitions were based solely on allegations of mistake. Phillips Academy also argued that lack of probable cause was demonstrated by the inconsistent positions taken among the petitions.

Willis argued Dana's objections, as trustee, to the CRAT petition had interfered with qualification of the trust as a CRAT in violation of her duties as trustee, and therefore independently violated the no contest provision of the trust. Willis was honoring his mother's expressly stated wishes by reforming the trust instrument to qualify as a CRAT, while Dana, as trustee, opposed it.

Counsel for Phillips Academy argued that the reformation petition was a wish lists of terms that Dana wanted as a beneficiary. The action was inappropriate for a trustee. He noted that after so many years of litigation, when it was time for

decisions to be reached, Dana was not present and had not put on any evidence.

After a hearing of less than eight hours, the court granted the no contest petition in favor of Willis and Phillips Academy. The court found that Dana filed the no contest petition as a private individual. The court noted the features of the petition which led to the conclusion that Dana filed the petition individually and not in her capacity as trustee, whereas her subsequent amended reformation petitions clearly stated that she was signing them in her capacity as trustee. The reformation petition constituted a direct contest of the trust brought without probable cause, and therefore, violated the no contest clause of the trust. Dana would not be entitled to a distribution under the trust. The trial court continued the question of attorney fees to be considered as part of the trial on the petition for surcharge. The trial court ultimately entered an order granting the no contest petition in favor of Willis and Phillips Academy on May 26, 2021.

On May 20, 2021, the interim successor co-trustees notified counsel that the IRS had granted the charitable deduction for the value of the charitable remainder interest, valued at $2,405,273, which was greater than anticipated. The ruling reduced the estate taxes owed by $1,045,424.

Dana filed further briefing on the issue of a continuance and appearance at trial. Willis objected to the filing, which he characterized as an unnoticed motion for reconsideration of the order denying a continuance.

On May 24, 2021, trial began on the removal petition. There was no appearance for Dana. The court construed Dana's further briefing to be a motion for reconsideration, which the

court denied. Willis argued that the court could consider the evidence presented in connection with the no contest petition as equally relevant to the removal petition. The probate court agreed that some of the evidence and the ruling on the no contest petition would be used in the court's removal decision.

Willis called expert witness John Hartog, who was a certified specialist in estate planning, probate, and trust law. He reviewed the trial exhibits, including the reformation petition. In his opinion, Dana, as trustee, fell below the standard of care when pursuing the reformation petition and the amended petitions. Among other aspects, she favored one set of beneficiaries over another. She disguised her personal interests as a reformation petition and used trust assets to advance that personal interest. In addition, she fell below the standard of care when she opposed the petition to reform the trust to qualify as a CRAT, in contravention of her statutory obligation, which would have increased the tax liability of the trust estate. She also fell below the standard of care with respect to her administration of the trust based on these actions and her pursuit of the Seifert litigation. She committed waste by failing to make her mother's residence productive and by expending trust assets on litigation that was of no benefit to the trust. In his opinion, payment of trustee fees to Dana was not justified. Falling below the standard of care justified removal of the trustee. If a trustee commits a breach of trust or falls below the standard of care, the trustee is unfit to serve, which is a basis for removal.

The court found Hartog was very qualified in terms of identifying the duties that Dana breached. The court stated that it previously found Dana filed the reformation petition as the trustee, as well as individually, for the benefit of some of the

beneficiaries and not others, which would in and of itself be ground for removal. The court added further grounds that there was a failure to maintain the administration of the trust, such as continuing the Seifert litigation, which resulted in the expenditure of a large amount of attorney fees. As trustee, she should have filed her own action to conform the trust in the manner that the trust provisions stated Allyne preferred, specifically the trust provisions stating that Allyne wanted the tax benefit to apply to the CRAT, and not have opposed the petition to reform the CRAT. The court found a clear violation of the duty of loyalty by filing the reformation petition and expending enormous amounts of attorney fees. In addition, failing to properly administer her mother's residence was a violation of the administration of the trust. Based on these breaches and the prior ruling on the no contest petition, the court ordered Dana removed as trustee.

The court turned to the surcharge issues. A real estate broker estimated that the fair rental value of Allyne's residence in 2016 was $5,300 per month. Willis used Allyne's accountings to argue that payments for Trentyn's private school tuition, Dana's trustee fees, expenditures in connection with Allyne's home and car, and attorney fees paid to various law firms were inappropriate.

The probate court expressed concern that the amount for attorney fees was large and might include legitimate expenses. Attorneys for Willis and Phillips Academy argued that it was all incurred for trust litigation and none of it was a legitimate expense. Willis's attorney argued that all of the fees listed were incurred for the reformation petition, the CRAT objections, or the

Seifert litigation. The attorneys were of no benefit to the estate and the attorney fees spent by Dana could be surcharged to her.

The probate court considered the no contest litigation and the objection to reformation of the CRAT to be liable for surcharge. The Seifert litigation was brought against the trustee, however, and involved business decisions by the trustee. A tax lawyer testified about the complicated negotiation and financing decisions involved in the buyout of the apartment building, as well as the complicated tax consequences. If the agreement had been consummated under the terms that Dana pursued and she had acquired the apartment building with seller financing, it would have impaired the trust as a CRAT and resulted in a complete loss of any tax benefit. Dana had offered to pay cash, but no appearance was made at trial to assert a defense for Dana based on her cash offer. The court concluded liability for the Seifert litigation had been established.

Willis presented an expert in auditing legal billing to discuss the various bills for attorney fees. Willis argued that Dana should be surcharged from the time that her mother died and she accepted the role of trustee, until the date that she was suspended.

The presentation of evidence and argument for the removal petition was completed in less than eight hours over a span of two days. The probate court ruled on the morning of the third day. The court confirmed the ruling removing Dana as trustee. Dana was surcharged for attorney fees paid from the trust for her reformation litigation and her objection to the CRAT. The court found Dana breached her fiduciary duties and acted in bad faith in prosecuting the reformation petition to exclude Willis and reduce Philips Academy's beneficial interest. The court also

found that the objections to the CRAT petition were in bad faith, since the trust document itself required all efforts be taken to qualify the CRAT for the benefit of the trust and the beneficiaries. Opposing the petition to conform the CRAT contravened the express terms of the trust. The total charges for attorney fees surcharged against Dana based on these litigation activities was $1,485,332.50.

The court found that Dana had made a bad business decision with regard to the Seifert litigation, but found no bad faith. In addition, the delay actually benefitted the trust, because the property appreciated substantially before the sale was eventually completed. Accordingly, no surcharge was imposed on the Seifert litigation.

The trust did not provide for payment of Trentyn's education expenses, so Dana was surcharged $132,424.60. The court also imposed a surcharge of $283,578.02 for the failure to rent out Allyne's home after her death. The court found the trustee fees were excessive, especially under the circumstances, and allowed $10,000 per month for the administrative duties that Dana performed for the trust. As a result, the total surcharge for overpayment of trustee fees was $562,200. The court excused the first year of payments for Allyne's car lease, but surcharged Dana for the remaining years for a total of $33,742. The total amount of the surcharges to be imposed against Dana was $2,497,076.52. Willis's attorney noted that another $72,000 must be surcharged for overpayment of trustee fees based on another accounting document, with which the probate court agreed.

On June 11, 2021, Dana filed a motion for relief from default judgment in the no contest proceeding under Code of Civil Procedure section 473, subdivision (b). Bohm filed his

42

declaration in support of the motion, attesting that his medical emergency was sudden and unexpected. Willis opposed the motion, and the probate court denied the motion for relief from the judgment in the no contest proceedings.

On June 18, 2021, the probate court entered its order removing Dana as trustee and ordering her to pay $2,132,905.20 to the trust as surcharges. The court awarded attorney fees and costs to Willis. An amended final judgment on the removal petition was filed on June 28, 2021.

On July 8, 2021, Dana filed a motion for relief from the judgment in the removal proceeding under Code of Civil Procedure section 473, subdivision (b). Willis opposed the motion, and the probate court denied the motion.

Dana filed a timely notice of appeal from the May 26, 2021 judgment and the June 28, 2021 judgment, including all appealable orders embraced therein.

## DISCUSSION

## Motion for Continuance

Dana contends the probate court abused its discretion by refusing to continue trial in light of her attorney's sudden medical emergency. We agree.

Trial courts may grant continuances under California Rules of Court, rule 3.1332(c), based on an affirmative showing of good cause, including "unavailability of trial counsel because of death, illness, or other excusable circumstances" or "substitution of trial counsel, but only where there is an affirmative showing that the substitution is required in the interests of justice." (Cal. Rules of

43

Court, rule 3.1332(c).) In ruling on a motion for continuance, the court considers all of the facts and circumstances relevant to the determination, which may include the proximity to trial date, previous delays due to any party, the length of the continuance necessary, alternative solutions, prejudice to parties or witness as a result of the continuance, the court's calendar and the impact on other pending trials, and the interests of justice. (Cal. Rules of Court, rule 3.1331(d).)

"A motion for continuance is addressed to the sound discretion of the trial court. (*Link v. Cater* (1998) 60 Cal.App.4th 1315, 1321.) However, the " 'trial judge must exercise his discretion with due regard to all interests involved, and the refusal of a continuance which has the practical effect of denying the applicant a fair hearing is reversible error.' " (*In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1169.)" (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395 (*Oliveros*).)

" 'Judges are faced with opposing responsibilities when continuances . . . are sought. On the one hand, they are mandated by the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.) to actively assume and maintain control over the pace of litigation. On the other hand, they must abide by the guiding principle of deciding cases on their merits rather than on procedural deficiencies. (*Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1085.) Such decisions must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency. (Cf. *Cordova v. Vons Grocery Co.* (1987) 196 Cal.App.3d 1526, 1532, 1533 [when evaluating dismissal of action for delay in

prosecution, policy favoring expeditious administration of justice by compelling prompt and diligent prosecution of actions subordinate to policy favoring trial on merits].)' (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 398–399.)" (*Oliveros, supra*, 120 Cal.App.4th at p. 1395.)

In this case, the probate court refused to grant a continuance because the court had set aside five weeks for trial, the shutdown of the courts due to the COVID pandemic had caused several trials to be delayed and litigants who were waiting for trial dates were frustrated, and the parties had spent time and money preparing for trial. The court expected Beek to take Bohm's place in this high-stakes litigation with a few days of preparation, despite her representation that she had not even planned to be present for the trial because her grandfather was in the hospital, and despite the fact that Beek had never even seen a civil trial. Alternatively, the court expected another attorney to fill in for Bohm with a few days of preparation. Had another attorney been substituted in to try the case as a result of Bohm's medical emergency, that circumstance alone would have been good cause to allow a continuance of 30 to 60 days to allow the new attorney to adequately prepare.

The fact that over a span of five years, Dana engaged multiple attorneys for civil litigation and probate matters, both in her capacities as trustee and as an individual beneficiary, was not a reason to deny her request for a continuance, as Bohm was the attorney who had prepared for trial. The fact that she sued several of her former attorneys for legal malpractice, both in her capacity as trustee and individually, was also not a factor to deny a continuance. In fact, Division Four of this appellate court found that she waited too long to file a malpractice action against

45

Masteller and her firm, so her claims were barred by the statute of limitations. (*Urick v. Lewitt*, *supra*, B312238.) Many of the cases that she filed against other former attorneys preserved the statute of limitations based on potential damages in the current matter. (*Urick v. Elkins Kalt Weintraub Reuben Gartside, LLP*, *supra*, B310056.) Willis himself entered into a tolling agreement with Boykin to extend the statute of limitations for legal malpractice.

If the time and expense spent preparing for a trial were sufficient reason to deny a continuance, no trial would be continued based on the sudden illness or death of a party's attorney. "The death or serious illness of a trial attorney or a party 'should, under normal circumstances, be considered good cause for granting the continuance of a trial date[.]' (Cal. Stds. Jud. Admin., § 9.)" (*Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, 1247–1248.) The extraordinary circumstances of the COVID pandemic and the resulting complications required the court to provide greater accommodations to parties, not fewer, and was not an excuse to deprive a litigant of a fair hearing.

"We recognize, as did the courts in *Bahl v. Bank of America, supra*, 89 Cal.App.4th 389, *Estate of Meeker* (1993) 13 Cal.App.4th 1099, *Link v. Cater*, *supra*, 60 Cal.App.4th 1315, *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, and most recently *Hernandez*[*, supra,*] 115 Cal.App.4th 1242, that trial courts are under great pressure to expedite their case loads to achieve judicial efficiency. 'But efficiency is not an end in itself. Delay reduction and calendar management are required for a purpose: to promote the just resolution of cases on their merits. (*Thatcher v. Lucky Stores*[*, supra,*] 79 Cal.App.4th 1081, 1085;

Gov. Code, § 68507; Cal. Stds. Jud. Admin., § 2.) Accordingly, decisions about whether to grant a continuance or extend discovery "must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency." (*Bahl v. Bank of America*[, *supra*,] 89 Cal.App.4th 389, [at pp.] 398–399.) What is required is balance. "While it is true that a trial judge must have control of the courtroom and its calendar and must have discretion to deny a request for a continuance when there is no good cause for granting one, it is equally true that, absent [a lack of diligence or other abusive] circumstances which are not present in this case, a request for a continuance supported by a showing of good cause usually ought to be granted." (*Estate of Meeker*, *supra*, 13 Cal.App.4th at p. 1105.)' (*Hernandez v. Superior Court*, *supra*, 115 Cal.App.4th at pp. 1246–1247.)" (*Oliveros*, *supra*, 120 Cal.App.4th at p. 1396.)

Dana had not previously requested a continuance. We conclude the probate court abused its discretion under the circumstances of this case by denying Dana's request for a continuance of a length necessary to accommodate her trial attorney's sudden and serious medical emergency.

**Prejudice**

Willis contends that Dana must show she was prejudiced by the probate court's denial of a continuance. Assuming, without deciding, that Dana must show prejudice, the evidence in the record demonstrates a reasonable probability that she would

47

have achieved a more favorable result had she been granted a continuance.

## A.   No Contest Clauses Generally

A "no contest clause" is a provision that penalizes a beneficiary for filing a pleading.  (Prob. Code, § 21310, subd. (c).)[3] "A no contest clause 'essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument.'  [Citation.]  'The purpose of no contest clauses "is to discourage will contests by imposing a penalty of forfeiture against beneficiaries who challenge the will." ' [Citation.]  'In essence, a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument.' " (*Betts v. City National Bank* (2007) 156 Cal.App.4th 222, 231, fn. omitted.)

"Such clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument.  [Citation.]  [¶]  In tension with these public policy interests are the policy interests of avoiding forfeitures and

---

[3] " 'Pleading' means a petition, complaint, cross-complaint, objection, answer, response, or claim."  (Prob. Code, § 21310, subd. (d).)  A "contest" is "a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced."  (Prob. Code, § 21310, subd. (a).)

promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument.  [Citation.]  In light of these opposing interests, the common law in California recognized the enforceability of no contest clauses, albeit strictly construed, 'so long as the condition was not prohibited by some law or opposed to public policy.' " (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422.)

Under current California law, a no contest clause will only be enforced against a pleading that challenges certain property transfers, a creditor's claim, or "a direct contest that is brought without probable cause."  (Prob. Code, § 21311, subd. (a)(1).)  A " '[d]irect contest' " is a contest that alleges one or more terms of a protected instrument are invalid based on a ground listed in Probate Code section 21310, subdivision (b)(4), including "[m]enace, duress, fraud, or undue influence."  "For the purposes of this section, probable cause exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery."  (*Id.*, § 21311, subd. (b).)

## B.    Filing by a Beneficiary

To be considered a contest, the pleading at issue must have been filed by a beneficiary.  (Prob. Code, § 21310, subd. (a).)  The record in this case reflects that Dana intended to present evidence at trial which established she filed the reformation petition in her capacity as trustee and not as a beneficiary.

In connection with the anti-SLAPP proceedings, an experienced and esteemed probate court judge considered the

2016 petition to have been filed by Dana as trustee, but this appellate court concluded that whether Dana had filed the petition in her role as trustee or beneficiary or both was ambiguous from the face of the pleading. The body of the petition referred to "Petitioner, Dana Urick, Trustee of The Allyne L. Urick Trust," without mentioning her status as a beneficiary, suggesting the petitioner was Dana in her capacity as trustee. The petition did not expressly state that Dana was filing the petition in her individual capacity as a beneficiary, but it was brought on behalf of an aggrieved party. Other aspects of the reformation petition were consistent with a pleading filed by Dana as a beneficiary, such as the attorney caption and the signature blocks which lists her name without referring to her position as trustee. In the context of an anti-SLAPP motion, the evidence was reasonably susceptible of Willis's interpretation that Dana filed the petition in her capacity as a beneficiary.

At the trial on the no contest petition, Willis's evidence that Dana filed the pleading as a beneficiary consisted solely of inferences from the ambiguous statements in the reformation petition. He did not introduce any extrinsic evidence to support finding that Dana brought the petition as a beneficiary, such as other pleadings filed by Masteller on Dana's behalf as a beneficiary, letters Masteller wrote on behalf of Dana as a beneficiary, or payments that Dana made personally for Masteller's legal work.

The record shows Dana's extrinsic evidence, however, if credited by the trier of fact, conclusively establishes Dana filed the petition solely in her capacity as trustee. Masteller declared that her law firm represented Dana in her capacity as trustee only. The firm was not retained by, and never at any point

represented, Dana in her individual capacity as a beneficiary. Dana was represented in her individual capacity as a beneficiary by independent counsel.

Masteller explained the ambiguities in the 2016 petition. Her intent in drafting the first sentence of the petition was to define the petitioner as "Dana Urick, Trustee of the Allyne L. Urick Trust." The petition never stated that it was brought by Dana as an individual. In the petition, Masteller referred to Civil Code section 3399 for the proposition that a written instrument may be reformed by an aggrieved party. In Masteller's view, Allyne was the aggrieved party as a result of the incorrectly drafted trust, and Dana, as her successor trustee, brought the petition to reform the trust to reflect Allyne's intent. She did not identify Dana as trustee in the attorney caption and signature blocks, but the omissions were inadvertent, primarily because Masteller believed the statements in the body of the petition were controlling and sufficient to establish that the petitioner was Dana as trustee.

Dana represented in her offer of proof that Masteller would testify unequivocally at trial, as she had in deposition, that Dana filed the 2016 reformation petition in her capacity as trustee. We note that this testimony would be consistent with Masteller's October 2015 letter to Willis, before the reformation petition was filed, stating that she represented Dana as trustee of the trust, in which she copied Dana as trustee. If the trier of fact finds Masteller's testimony credible, then Dana's 2016 reformation petition could not have been filed in any capacity other than as

51

trustee.[4]  Masteller could not have filed a petition on behalf of a client that she did not represent.

Other evidence in the record supports finding that Dana did not file the pleading as a beneficiary.  Dana represented she would testify that she intended and understood the reformation petition to be filed in her capacity as trustee.  In the surcharge trial, evidence showed the attorney fees paid in connection with the reformation petition were paid by the trust, not by Dana personally, which is further evidence that Dana filed the pleading in her capacity as trustee.  The trier of fact may credit Masteller's testimony, Dana's testimony, or both, to find the 2016 reformation petition was filed in Dana's capacity as trustee and therefore was not a contest.

## C.    Statutory Grounds for a Direct Contest

Even if the trier of fact were to conclude that Dana filed the 2016 reformation petition as a beneficiary, however, the record also contains evidence to support finding that the petition was brought solely on the ground of mistake, which is not a basis for a direct contest.

The petition expressly stated that it was based on the ground of mistake, but mixed in allegations of misrepresentation and nondisclosure consistent with a claim of fraud.  As a result, the grounds for the petition were ambiguous and reasonably susceptible to Willis's interpretation in the anti-SLAPP

---

[4] In weighing Masteller's credibility at trial, we note the statute of limitations has run on any legal malpractice action arising from Masteller's drafting of the 2016 reformation petition. (*Urick v. Lewitt, supra*, B312238.)

proceedings that the pleading was based on a claim of fraud. After this appellate court found Willis had made a prima facie showing that the petition was based on fraud, Dana filed amended reformation petitions which omitted the ambiguous allegations. Omission of the allegations did not substantially change the character of the petition, suggesting that the stray allegations of misrepresentation and nondisclosure were included for background context and were not a basis for the pleading. Testimony by Masteller and Dana, if credited by the trier of fact, would clarify that the petition was brought solely on the basis of mistake, not on the basis of fraud, duress, or undue influence.

### D. Probable Cause

Even if Dana brought the petition as a beneficiary on grounds that included fraud, duress, or undue influence, there is a reasonable probability that she would have achieved a more favorable outcome on the issue of probable cause to bring the 2016 reformation petition. Under Probate Code section 21311, probable cause existed if the facts known to Dana at the time that she filed her pleading would have caused a reasonable person to believe that there was a reasonable likelihood that the requested relief would be granted after further investigation or discovery.

In Willis's brief on appeal, he concedes it is undisputed that Allyne's restated trust did not qualify as a CRAT. In fact, Willis filed a competing petition to reform the trust as a CRAT, which the probate court granted. These circumstances support finding that a reasonable person in Dana's place would believe the restated trust failed to meet Allyne's objectives and a petition to

53

reform the trust to accomplish Allyne's intent would be granted. To establish probable cause for the reformation petition, Dana did not need to show that every line of the trust would be reformed exactly as she proposed. Multiple distribution schemes were possible to achieve Allyne's stated intent, and under the statute, probable cause exists even though a beneficiary anticipates further investigation or discovery. The trier of fact could find Dana had probable cause to believe the probate court would reform the trust as she requested.

One of the primary reforms that Dana proposed was to eliminate the CRAT structure. It was undisputed that the restated trust, as drafted, did not qualify as a CRAT. A reasonable person could believe from the evidence that the probate court would reform the trust to eliminate the CRAT, because it was inappropriate for the trust's assets and did not achieve Allyne's testamentary goals. Allyne consistently stated her testamentary goals were to provide an income to Dana for her lifetime and an income to Trentyn for a set number of years until he reached adulthood, while providing the smallest distribution necessary to Willis to avoid a contest of her estate plan, and to realize any tax savings that could be achieved without interfering with her distribution goals.

Allyne's primary asset was a lucrative income from an apartment building on real property that had been in the Urick family for nearly 100 years. Dana intended to offer expert testimony that a CRAT was unworkable for the type of assets in Allyne's trust. Boykin stated that he expected the property would be liquidated and had not considered whether a CRAT was appropriate if the property were not liquidated. The evidence showed, however, that Allyne expected the trustee to retain the

apartment building.  In fact, the trust expressly gave Dana the power as trustee to retain the property and to continue to operate the business.  In Allyne's videotaped execution of the original trust, she wanted to extend the annuity payments to Trentyn because she thought if her assets remained as valuable as they had been, specifically referring to the apartment building, then Phillips Academy would end up getting several million dollars.  This evidence showed that Allyne expected and intended the successor trustee to retain the apartment building in the trust, and if the character of that asset was incompatible with the requirements of a CRAT or destroyed the tax savings of a CRAT, as Dana intended to show at trial, then Allyne's express desire was for the trustee to be able to retain the apartment building rather than be required to reform the document and liquidate the assets to take advantage of the tax savings of a CRAT.

There is also no evidence that Allyne wished to limit annuity payments to the beneficiaries to a maximum of 20 years.  Allyne consistently told Boykin that she wanted her children to receive payments for their lifetimes, and she wanted Trentyn to receive a distribution directly from her in trust for a set period of years.  In a letter, Boykin acknowledged the relatively young ages of her children.  The original trust provided annuity payments would end at the death of the last living recipient or when Trentyn reached age 35.  In the videotaped execution of the trust, Boykin described the term correctly once and incorrectly another time.  It is not clear which distribution Allyne believed she had provided in her trust.  The incorrect description, that payments would be made until her children passed away and Trentyn reached age 35, was more consistent with the distribution that Allyne requested.

Boykin testified in his deposition that he drafted a 20-year CRAT, but the original trust does not limit the annuity payments to 20 years. If the payments in the original trust had been limited to a maximum of 20 years and Allyne understood the payments were limited to 20 years, there was no reason to extensively discuss in the videotape and in subsequent letters whether payments should be made to Trentyn until age 45. Allyne would have needed to live to age 105 for Trentyn to receive payments until age 45.

The restated trust obliquely altered the distribution term by limiting the annuity payments to the latest date allowed by the Internal Revenue Code. Allyne would not have been alerted merely by reading the provision that annuity payments were limited to a maximum of 20 years regardless of the other terms providing for payments for the lifetime of the recipients or until Trentyn reached age 35. Unlike the original version of the trust, Boykin did not correspond with Allyne to explain the changes to the trust or videotape Allyne's execution of the restatement. Based on this evidence, a reasonable person could suspect Allyne was not informed or did not understand the limited number of years that the annuity would be paid in order for the trust to qualify as a CRAT, and that the provisions conflicted with Allyne's stated intent to provide a lifetime income stream for her children and distributions for Trentyn, without regard to whether it qualified for beneficial tax treatment.

It is true that under Probate Code section 21540, if a trust indicates the transferor's intent to comply with the requirements for a CRAT, the provisions of the trust must be construed to comply with statutory provisions to conform to that intent. The restated trust in this case, however, could not simply be

56

construed to comply with statutory provisions and had to be conformed to qualify. Also under Probate Code section 21540, in no event may the fiduciary take an action or have a power that impairs the charitable deduction. This is not a case, however, where the trustee has taken an action that will disqualify a charitable deduction that the trust is otherwise qualified to receive. In this case, the parties agree that the trust did not qualify as a CRAT, and therefore, it was not entitled to a charitable deduction as drafted. Similarly, the provisions of the trust that required the trustee to take actions consistent with ensuring qualification of the trust as a CRAT did not apply if the trust had been previously determined not to qualify as a CRAT, which the parties agreed it did not.

Dana's proposed reformation eliminated any distribution to Willis. Dana believed Allyne had chosen to disinherit Willis based on Allyne's complaints about perceived slights and statements that Willis would receive nothing from her estate. The distributions to Willis in the estate plans that Eick drafted were carefully crafted to provide the minimum amount necessary to dissuade Willis from contesting the estate plan, or alternatively provided him nothing at all. Even after Allyne executed the original trust prepared by Boykin providing Dana and Willis with equal shares, she promptly signed multiple amendments disinheriting Willis. Boykin stated that Allyne revoked the amendment that he prepared by writing the word revoked and tearing it up in front of him, but she kept a handwritten version disinheriting Willis at her home without taking the same steps to revoke it.

There was no explanatory correspondence exchanged prior to Allyne's restatement of the trust or videography of Allyne's

execution of the restated trust, and the provisions added to the restated trust primarily related to the CRAT. A reasonable person in Dana's position, knowing her mother said she had disinherited Willis, could suspect the trust was restated to include several boilerplate provisions necessary to qualify the trust as a CRAT, but copied the distribution in the original trust through oversight or mistake. Boykin's explanation that Allyne chose to provide equal shares for Willis and Dana in the restated trust simply because Willis would have fought about any other distribution was not consistent with Allyne's previous statements to Dana, her statements to her prior estate planning attorney, or her conduct. Common estate planning techniques existed to provide a distribution to Willis that was less than the amount provided to Dana, yet substantial enough to discourage him from litigation. A reasonable person with the information that Dana had in 2016 could believe that further investigation and discovery would support that Allyne did not intend to provide equal shares of her estate to her children, and the drafter of the trust had provided them with equal shares by mistake. In the event that further investigation and discovery affirmed Allyne's intent to treat her children equally, the reformation petition could easily have been amended by the probate court to insert Willis's name as a coequal beneficiary to Dana, and granted as amended.

Similarly, Dana's proposed reformation significantly limited the likelihood that Phillips Academy would receive a distribution. Dana's evidence suggested her mother selected Phillips Academy as a remainder beneficiary simply for the unlikely event that there were assets left in her estate after the distributions provided. Boykin provided calculations to Allyne that showed all of her assets would be distributed through

58

annuity payments to the beneficiaries, such that the remainder received by Phillips Academy would be zero. Allyne executed her original trust on the basis of these calculations, with the understanding and agreement that the trust likely would not qualify for favorable tax treatment as a result. When Boykin estimated that Phillips Academy might receive as much as $3,000,000 to $10,000,000, Allyne decided to sign the document, but continue to consider the remainder to Phillips Academy. Dana's proposed reformation could easily have been amended to provide a remainder amount to Phillips Academy approximating the amount that Allyne expected the school would receive under the trust that she signed.

In short, the parties agreed the trust did not qualify as a CRAT. Both parties filed reformation petitions. Willis's arguments for reforming the trust to qualify as a CRAT were primarily based on boilerplate trust provisions and statutory law. His petition flipped Allyne's distribution goals on their head to make tax savings from the charitable remainder the primary goal of the plan, with the distributions to named beneficiaries subservient to qualification of the trust as a CRAT. Dana had as much evidence of Allyne's testamentary intent, or more, to support her effort to reform the petition when she filed it in 2016. If Dana had been able to present her evidence at trial, there is a reasonable probability that the trier of fact would have concluded Dana had probable cause to file her 2016 reformation petition based on the facts known to her at the time.

## E.    Removal and Surcharge

The order granting Dana's removal and surcharging her for various costs was based in substantial part on the probate court's order granting the no contest petition. Both orders must be reversed and remanded for further proceedings.

## DISPOSITION

The order granting the petition for instructions as to violation of the no contest clause and the order granting the petition for removal and surcharge are reversed. The cause is remanded for a new trial. The reversal of the petition for removal does not impact the probate court's January 23, 2020, orders suspending Dana as trustee and appointing interim successor trustees, which orders remain in effect. Appellant Dana Urick is awarded her costs on appeal.

NOT TO BE PUBLISHED.

MOOR, J.

We concur:

BAKER, Acting P. J.

KIM, J.